IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHAD J. MCCLOSKEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. Action No. 14-030-GMS |
| | ) |
| BUREAU CHIEF JAMES WELCH, et al., | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM

## I. INTRODUCTION

The plaintiff, Chad J. McCloskey ("McCloskey"), an inmate at the James T. Vaughn Correctional Center ("VCC") in Smyrna, Delaware, filed this lawsuit pursuant to 42 U.S.C. § 1983.[1] The operative complaint consists of Docket Items 3, 20, and 58. (*See* D.I. 67.) McCloskey appears *pro se* and was granted permission to proceed *in forma pauperis*. (D.I. 7.) Pending before the court are motions to dismiss and a motion for summary judgment filed by State defendant James Welch ("Welch"), a motion for summary judgment filed by medical defendants Correct Care Solutions, LLC ("CCS") and Louise Desrosiers, M.D. ("Dr. Desrosiers"), and the plaintiff's request for counsel. (D.I. 69, 70, 74, 98.)

## II. FACTUAL AND PROCEDURAL BACKGROUND

Mr. McCloskey alleges deliberate indifference to serious medical needs as a result of an injury he sustained on June 3, 2013. At the time, CCS was the medical service contract provider

---

[1] When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

for the Delaware Department of Correction ("DOC"). Its contract with the DOC expired on June 30, 2014, when a different provider began providing medical care to inmates. McCloskey alleges delay in medical care and treatment and lack of post-surgical follow-up care including pain management and physical therapy. (D.I. 3, 20, 38.)

The record reflects that McCloskey injured his right arm on June 3, 2013, while doing push-ups. (D.I. 21 at 2; D.I. 72 at A-0211.) He was seen by CCS medical personnel and evaluated the same day after telling a correctional officer he had injured himself. (D.I. 72 at A-215.) CCS personnel contacted Dr. Desroisers, and she gave a verbal order for ice packs and a prescription for Tylenol, but McCloskey refused the treatment.[2] (*Id.* at A-54, A-215-16.) Dr. Desrosiers indicated that she wanted to see McCloskey within the week. (*Id.* at A-56.) When Dr. Desrosiers examined McCloskey three days later, on June 6, 2013, she ordered an x-ray of his right arm and referred him for outpatient treatment with an orthopedic specialist. (*Id.* at A-45, A-53, A-211, A-214.) Medical notes indicate that in 2005 McCloskey was involved in a severe motor vehicle accident that resulted in a right shoulder fracture. (*Id.*)

McCloskey submitted a sick call request on June 13, 2013, stating that he was told the previous week that he needed an x-ray the following day. (*Id.* at A-212.) X-rays of the right upper arm and shoulder were taken on June 14, 2013, and revealed a fractured intramedullary rod

---

[2]That day, McCloskey submitted a medical grievance, No. 267782, "requesting medical personnel capable of treating [his] injury correctly." (D.I. 21 at 2.) The grievance was deemed resolved on September 5, 2013, noting that McCloskey had since been seen and underwent surgery on July 29, 2013. (*Id.* at 3.) McCloskey appealed. (*Id.* at 4.) It was determined that, "while not timely, the grievant did receive treatment for his fracture." McCloskey's grievance was upheld in part for "the medical vendor [to] put into place a process to ensure that the grievant's concerns are followed up in a timely manner and [to] monitor his treatment plan. Deny all other aspects of this grievance." (*Id.* at 5.) On October 2, 2013, Welch upheld McCloskey's grievance.

2

that was present in McCloskey's arm on the date of the injury. (*Id.* at A-42.) McCloskey was next seen by Dr. Desrosiers on June 25, 2013, for follow-up. (*Id.* at A- 223.) Dr. Desrosiers submitted an outpatient referral request for McCloskey to see an outpatient orthopedic specialist "ASAP please." (*Id.* at A-52.)

Progress notes indicate that on June 27, 2013, McCloskey was concerned that he had not seen an outside specialist and was informed that the consultation had been scheduled. (*Id.* at A-0214.) On July 1, 2013, McCloskey was examined by CCS physician Laurie Ann Spraga, D.O. ("Dr. Spraga"). (*Id.* at A-222.) McCloskey was ordered to remain on pain medications and keep his arm in a sling. (*Id.*) On that same date, a CCS outpatient referral request indicates that McCloskey was scheduled to see Dr. DuShuttle. (*Id.* at A-12.) Progress notes dated July 2, 2013 state "no acute distress . . . right shoulder no pain with palpation . . . see ortho as planned." (*Id.* at A-214, A-262.)

On July 9, 2013, McCloskey was taken to Dr. DuShuttle's office for consultation but was not seen because Dr. DuShuttle was "behind" and the appointment was to be rescheduled. (*Id.* at A-48, A-262.) The same day, Dr. Desrosiers completed another outpatient referral request for McCloskey to be seen by Dr. DuShuttle. (*Id.* at 50.) Dr. Desrosiers sent a fax to Dr. DuShuttle's office on July 11, 2013, that McCloskey "should be seen earlier," and he was seen by Dr. DuShuttle the same day (*Id.* at A-14, A-243.) Dr. DuShuttle examined McCloskey, advised him that his upper right arm was broken, and recommended reconstructive surgery. (*Id.* at A-14-15.) At the time, McCloskey complained of "having a lot of pain." (*Id.*) On July 15, 2013, CCS transmitted a request for McCloskey to undergo pre-admission blood work for his upcoming surgery. (*Id.* at A-47.)

Dr. Desrosiers examined McCloskey on July 16, 2013, and discussed the planned surgery. (*Id.* at A-223.) On the same date Dr. Desrosiers completed an outpatient referral request for McCloskey that was faxed with the note "please schedule ASAP." (*Id.* at A-13.) The surgery was scheduled for the end of July.

McCloskey arrived at the VCC infirmary the day prior to his scheduled surgery. (*Id.* at A-225, A-282.) July 28, 2013 progress notes indicate that McCloskey was resting comfortably and had no complaints of pain or discomfort. (*Id.*) The next day, July 29, 2013, McCloskey was transported to Kent General Hospital where Dr. DuShuttle performed surgery. (*Id.* at A-79.) The surgery involved removal of the broken intramedullary rod and proximal distal screws, re-rodding of the humerus, and bone grafting of the nonunion site of the humerus. (*Id.*) McCloskey was prescribed Keflex 500 mg and Percocet 325 mg for pain following his July 31, 2013 discharge from the hospital. (*Id.* at A4-6, A-81, A-86.)

McCloskey then returned to the VCC infirmary where he remained until August 12, 2013. (*Id.* at A-266-281.) Progress notes indicate that while in the infirmary, McCloskey refused care to surgical site, vitals, dressings, post-op antibiotics, and pain medication, even though it was contraindicated and could cause his medical conditions to worsen. (*Id.* at A-39-41, A-93-115, A-266.) McCloskey was discharged from the infirmary with orders to follow-up with Dr. DuShuttle and Dr. Desrosiers. (*Id.* at A-266.)

McCloskey submitted a sick call slip on August 14, 2013, complaining of right upper arm and shoulder pain and that he could not lift his arm higher than his shoulder even with the help of his other arm. (*Id.* at A-237.) McCloskey indicated the pain was only at night. (*Id.*) He was

seen by CCS staff the next day who advised McCloskey that he was three weeks post surgery. (*Id.*) He was given pain medication. (*Id.*)

On August 29, 2013, McCloskey had a follow-up appointment with Dr. DuShuttle. (*Id.* at A-79.) McCloskey relayed experiencing weakness, but with decreased pain, improved swelling and no redness. (*Id.*) Dr. DuShuttle noted that McCloskey "is always going to have weakness in arm secondary to previous nerve damage." (*Id.*) Dr. DuShuttle's report states, "no medication needed at this time."[3] (*Id.* at A-80.) Dr. Desrosiers examined McCloskey on September 5, 2013. (*Id.* at A-0262.) She noted that he was "already exercising" and cautioned about over-exercising. (*Id.*) He was "well healed." (*Id.*)

McCloskey submitted a sick call slip on March 2, 2014, with numerous complaints including right arm pain, an inability to sleep due to pain, cannot stretch or workout with more pain, cannot control right wrist, cramping, stiffness, and range of motion lessening. (*Id.* at A-235.) He requested a wrist brace. (*Id.*) McCloskey was evaluated by CCS staff on March 5, 2014. McCloskey had a pain rating of three out of ten. (*Id.*) His chart was provided to Dr. Desroisers for review. (*Id.*) A March 6, 2014 physician's order indicates that McCloskey may be scheduled to see a provider due to non specific complaints of right arm pain. (*Id.* at A-220.)

---

[3]The same date, McCloskey submitted a grievance, No. 272304, seeking medical attention complaining his grievances go unanswered. (D.I. 21 at 12.) He explained that, after he submitted a sick call slip, he was seen by medical for complains of pain, lack of movement, and an inability to sleep and was told the he could only receive Tylenol which he could purchase from the Canteen. He explained he was seen by Dr. DuShuttle who "did nothing for above complaints." (*Id.*) The grievance was deemed unresolved, noting that McCloskey was seen by Dr. Desrosiers on September 5, 2013, with a plan to follow-up as needed with the provider. (*Id.* at 16.) McCloskey appealed and asked for a doctor to tell him why he could not lift his arm over his shoulder months after surgery or explain his extreme pain. (*Id.* at 14.) On November 27, 2013, Welch denied the grievance. (*Id.* at 17.)

5

McCloskey was evaluated by CCS nurse Bernard Akihito Addogoh on June 17, 2014, for an evaluation of his complaints of suffering from right hand atrophy post-surgery. (*Id.* at A-220). McCloskey was given a thirty day supply of Motrin 400 mg for pain management and a prescription for a bottom bunk assignment. (*Id.* at A-220, A-245.) During the relevant time-frame, McCloskey was under mental health segregation, and the mental health segregation notes do not indicate that he complained of acute pain or distress to prison staff during routine checks. (*Id.* at A-16-19, A-127-135, A-149-180.)

When the new medical service provider's personnel saw McCloskey in July and August 2014, they advised McCloskey to continue to engage in light exercise and to take Motrin as needed. (D.I. 72 at A-198, A-234, A-265.) When McCloskey was seen on August 8, 2014, he denied taking Motrin as ordered because "it's Motion, it doesn't do anything" and stated that he continued with limited exercise. (*Id.* at A-232.) There was no swelling and good range of motion in the shoulder. (*Id.*)

### III. STANDARD OF REVIEW

The court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

The defendants[4] move for summary judgment on the grounds that McCloskey: (1) failed to exhaust his administrative remedies as is required under the Prison Litigation Reform Act ("PLRA");[5] (2) failed to present any evidence that the defendants violated his constitutional rights; (3) failed to present an expert opinion to support his constitutional claims; and (4) failed to present evidence that CCS maintained a policy or custom that caused his constitutional harm. (D.I. 70, 71, 74.) The defendants also argue that McCloskey's request for injunctive relief is moot. (*Id.*)

---

[4] Welch incorporates the medical defendants' arguments for summary judgment into his motion for summary judgment. (D.I. 74.) The court will not address the motions to dismiss filed by Welch since, as will be discussed, based upon the record, no reasonable jury could find violations of McCloskey's constitutional rights.

[5] The court will not address the exhaustion of administrative remedies issue. Sealed docket item 21 contains documents indicating that McCloskey exhausted his administrative remedies as is required under the PLRA.

## IV. DISCUSSION

McCloskey argues that, contrary to the defendants' position that he received immediate care and continued monitoring, it took two months to "fix a broken bone." (D.I. 95.) He further argues that, contrary to the defendants' claims, he has "not had follow-up care outside of over the counter meds" and the "lack of follow-up like physical therapy left [him] with atrophy and decreased strength in movement." (*Id.*) The defendants argue that summary judgment is appropriate given that the record completely refutes McCloskey's allegations, shows that he was provided with medical treatment and surgery as soon as practicable, and shows that he was provided with continued care.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle v. Gamble*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (unpublished) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000)). Also, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted). An inmate's claims

8

against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle v. Gamble*, 429 U.S. at 107.

Finally, a prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. at 104-05. However, a delay or denial of medical treatment claim is approached differently than an adequacy of care claim. *U.S. ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979).

> Unlike the deliberate indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry – since there is no presumption that the defendant acted properly, it lacks the objective, propriety of medical treatment, prong of an adequacy of care claim. Absent that objective inquiry, extrinsic proof is not necessary for the jury to find deliberate indifference in a delay or denial of medical treatment claim. All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non medical factors. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 68-9 (3d Cir. 1993); *United States v. Michener*, 152 F.2d 880, 885 (3d Cir. 1945) ("[I]t is for the jury to determine the weight to be given to each piece of evidence . . . particularly where the question at issue is the credibility of the witness.").

*Pearson v. Prison Health Serv.*, 850 F.3d 526, 537 (3d Cir. 2017).

While McCloskey claims that Dr. Desrosiers delayed or denied him medical care, it is undisputed that after he was injured on June 3, 2013, she examined him, diagnosed him, ordered an x-ray, and referred him for outpatient treatment. The record indicates that Dr. Desrosiers sought appointments for McCloskey "ASAP." When McCloskey arrived for his first consultation with Dr. DuShuttle, he was not seen because Dr. DuShuttle was "behind." When rescheduling the appointment, Dr. Desrosiers faxed Dr. DuShuttle's office that McCloskey

9

"should be seen earlier." When she made the referral for surgery, she requested it be scheduled "ASAP."

There is nothing in the record to support a finding that any delay was motivated by non-medical reasons. Dr. Desrosiers sought an x-ray for the outside consult with Dr. DuShuttle and, once it was obtained, prepared the necessary paperwork for McCloskey to see Dr. DuShuttle. Dr. DuShuttle's inability to see McCloskey at the first consultation appointment, rescheduling of the consultation appointment, and scheduling the surgery were not under Dr. Desrosiers' control. The record reflects that at every turn Dr. Desrosiers asked Dr. DuShuttle's office to schedule matters "ASAP." In addition, McCloskey's condition was continually monitored from the time of his injury on June 3, 2013, until he underwent surgery on July 29, 2013, and thereafter at the VCC infirmary. Based upon the foregoing, the court will grant Dr. Desrosiers' motion for summary judgment on issue of delay in medical care.

McCloskey also argues that he was not provided with post-operative follow-up care in the form of pain management and physical therapy. It seems that McCloskey's claim is that he is not satisfied with the follow-up treatment he was provided, rather than a claim of an outright denial of follow-up care. Regardless, his position is not supported by the evidence of record. Dr. DuShuttle's report of McCloskey's first follow-up appointment specifically states that no medications are needed. It made no reference that physical therapy was indicated. Instead, it states that McCloskey will always have weakness in the arm secondary to previous nerve damage. In addition, McCloskey was advised to take Tylenol for pain. When he was seen by Dr. Desrosiers on September 5, 2013, she cautioned him about over-exercising. He was evaluated in March and June 2014 and prescribed Motrin for pain. Medical records indicate that when the

new medical service provider personnel saw McCloskey in July and August 2014, they advised McCloskey to continue to engage in light exercise and to take Motrin as needed.

The deliberate indifference standard "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients," the court must "disavow any attempt to second-guess the propriety or adequacy of [their] particular course of treatment" so long as it "remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation marks omitted); *see also Brown v. Borough v. Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.").

Here, there is no evidence of record suggesting that Dr. Desrosiers' treatment decisions for McCloskey's condition were "a substantial departure from accepted professional judgment, practice, or standards" such that a reasonable jury could conclude that she "actually did not base [her] decision on such judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). As a result, no reasonable jury could find that she acted with the "obduracy and wantonness" that violates the Eighth Amendment and, therefore, summary judgment is appropriate on her behalf as to the post-operative follow-up care claim. *See Whitley v. Albers*, 475 U.S. 312, 319 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause. . . .").

As discussed, no reasonable jury could conclude that Dr. Desrosiers delayed medical treatment to McCloskey, denied follow-up medical care, or engaged in a pattern of conduct

11

indicating deliberate indifference to McCloskey's serious medical need. Therefore, the court will grant her motion for summary judgment.

McCloskey alleges that Welch, the former Chief of the Bureau of Correctional Healthcare Services for the DOC, violated his constitutional rights because Welch was involved in the medical grievance process and this made Welch aware of McCloskey's medical problems. According to McCloskey, this awareness is evidence of deliberate indifference to his medical needs. However, prison administrators cannot be deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer*, 991 F.2d at 69. "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill*, 372 F.3d at 236 (discussing *Durmer*, 991 F.2d at 69). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill*, 372 F.3d at 236.

The evidence of record does not support a finding that Welch was deliberately indifferent to McCloskey's medical condition. In his supervisory position, Welch was justified in relying upon the treatment provided McCloskey by the contract medical providers.[6] And, as discussed above, the evidence of record does not support a finding that medical personnel violated McCloskey's constitutional rights. McCloskey's theory that Welch is liable because he was

---

[6]Welch held the position of Chief of the Bureau of Correctional Healthcare Services of the DOC, an administrative and supervisory position. There is no indication that he provided medical care to inmates.

aware of McCloskey's medical condition does not amount to a violation of the Eighth Amendment. Therefore, the court will grant Welch's motion for summary judgment.

Finally, the court has concluded that the individual defendants did not violate McCloskey's constitutional rights under the Eighth Amendment. CCS, therefore, cannot be liable based on the theory that it established or maintained an unconstitutional policy or custom responsible for violating McCloskey's rights. *See Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 113 (3d Cir. 2007) (unpublished) (policy makers not liable in prison medical staff's alleged deliberate indifference to prisoner's serious medical needs, where, given that there was no underlying violation of prisoner's rights, policy makers did not establish or maintain an unconstitutional policy or custom responsible for violating prisoner's rights). Accordingly, summary judgment is appropriate in favor of CCS.

## V. CONCLUSION

For the above reasons, the court will: (1) grant the defendants' motions for summary judgment;[7] (D.I. 70, 74); (2) deny as moot the motions to dismiss filed by Welch (D.I. 69, 74); and (3) deny as moot the plaintiff's request for counsel (D.I. 98).

An appropriate order will be entered.

UNITED STATES DISTRICT JUDGE

April 5, 2018
Wilmington, Delaware

---

[7]Because the court has determined that the defendants did not violate McCloskey's rights under the Eighth Amendment of the United States Constitution, it finds it unnecessary to address the other grounds for summary judgment rised by the defendants.

13